IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Amelia Woods-Salters, | ) | C/A No.: 1:19-3406-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Mary Geiger Lewis, United States District Judge, dated August 17, 2020, referring this matter for disposition. [ECF No. 20]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 19].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied

the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On December 1, 2014, Plaintiff protectively filed applications for DIB and SSI in which she alleged her disability began on November 14, 2014. Tr. at 115, 117, 269–74, 275–83. Her applications were denied initially and upon reconsideration. Tr. at 154–58, 162–65, 166–69. On June 20, 2018, Plaintiff had a video hearing before Administrative Law Judge ("ALJ") Christine Guard. Tr. at 38–94 (Hr'g Tr.). The ALJ issued an unfavorable decision on November 21, 2018, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 6, 2019. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 45 years old at the time of the hearing. Tr. at 40, 269. She completed college. Tr. at 69. Her past relevant work ("PRW") was as a

cashier, hotel reservationist, teacher's aide, and yarn machine operator. Tr. at 85–86. She alleges she has been unable to work since November 14, 2014. Tr. at 269.

### 2.    Medical History

Plaintiff presented to Doctor's Care on November 18, 2014, complaining of elevated blood pressure. Tr. at 743. She endorsed multiple stressors, including a job in which the staff harassed her, her daughter's mental illness, and threats from family members to take her daughter away from her. *Id.* She reported left chest wall pain that occurred intermittently. *Id.* Her blood pressure was elevated at 162/94 mm/Hg. Tr. at 744. Tiffany Mahaffey, NP ("NP Mahaffey"), noted Plaintiff was overweight, in moderate distress, crying, and demonstrated anxious, sad, and tearful mood and affect. *Id.* She assessed elevated blood pressure, chest pain, and acute stress reaction. Tr. at 745. She encouraged Plaintiff to enroll in an exercise program and monitor her weight and blood pressure. *Id.*

Plaintiff presented to Carrie M. Crum, APRN ("NP Crum"), to establish treatment on November 21, 2014. Tr. at 406. She reported a recent nervous breakdown and trouble with anxiety and feeling overwhelmed as she dealt with her daughter's mental health problems. *Id.* She endorsed crying and feeling shaky. *Id.* NP Crum observed Plaintiff to be alert and oriented, to interact appropriately, to maintain good eye contact, to show normal mood

and affect, and to be crying with her hands shaking throughout the visit. Tr. at 407. She noted Plaintiff had a history of hypothyroidism, but deferred treatment. *Id.* She assessed anxiety and depression, prescribed Prozac 20 mg, and Hydroxyzine Pamoate 50 mg, and encouraged Plaintiff to seek counseling. *Id.*

Plaintiff requested NP Crum complete Family and Medical Leave Act ("FMLA") paperwork on her behalf on November 26, 2014. Tr. at 404. She reported she could not work because of anxiety, stress, and depression. *Id.* She stated she felt anxious and inpatient, often paced, and could not handle her job responsibilities. *Id.* She denied side effects from her medications, but had not yet noticed significant improvement. *Id.* She admitted the medications helped her sleep, but indicated she continued to have crying outbursts. *Id.* She endorsed fatigue, anxiety, depression, panic attacks, poor concentration, sleep disturbance, and stress on a review of systems ("ROS"). *Id.* NP Crum observed Plaintiff to be alert and oriented, to interact appropriately, to maintain good eye contact, to have appropriate mood and affect, and to be crying during the visit. Tr. at 404–05. She continued Plaintiff's medications. *Id.* She completed the FMLA form, writing: "Due to patient's uncontrolled anxiety, grief, and depression, will need prolonged absence from work to treat this. P[atient] unable to perform productive work without having panic attack or breakdown." Tr. at 598. She noted Plaintiff's

condition had commenced on November 14, 2014, and that she was "unable to attend work at this time due to uncontrolled anxiety and depression" and would "need treatment, counseling, and continued evaluation for 3–6 mths." *Id.* She indicated Plaintiff was "on prescription drugs and undergoing mental health counseling" and was "unable to perform productive work at th[e] time." Tr. at 599.

On January 21, 2015, Plaintiff reported taking her medication as directed and denied side effects. Tr. at 402. She indicated her anxiety was improved, but still present, as she continued to worry about her daughter and be easily upset. *Id.* She endorsed fatigue, anxiety, depression, excessive worry, stress, sleep disturbance, and caregiver grief on an ROS. *Id.* NP Crum noted Plaintiff was alert, oriented, and interacting appropriately. *Id.* She indicated Plaintiff had good eye contact and appropriate mood and affect. Tr. at 403. She assessed hypothyroidism, anxiety, and depression. *Id.*

Plaintiff presented to Laura Langley, MS, LPC ("Counselor Langley"), for a psychotherapy intake assessment on January 28, 2015. Tr. at 425. She reported multiple life events caused her to have a breakdown with residual anxiety, depression, tearfulness, hopelessness, and overwhelmed feeling. *Id.* Counselor Langley observed Plaintiff to have normal appearance, intact memory, appropriate dress, good attention/concentration, normal motor activity, normal thought content, good insight, normal perception, good

judgment, normal flow of thought, appropriate affect and interview behavior, anxious mood, normal speech, and orientation to person, place, and time. *Id.* Plaintiff reported an abusive marriage, a subsequent relationship that ended badly, discrimination on a prior job, and difficulty dealing with her daughter who had been diagnosed with bipolar disorder and schizophrenia. Tr. at 426. Counselor Langley assessed adjustment disorder with mixed anxiety and depressed mood. *Id.*

On February 2, 2015, Counselor Langley indicated Plaintiff's treatment goal was to decrease depression and anxiety symptoms. Tr. at 413. She estimated Plaintiff could meet her goal within three months. *Id.*

Plaintiff followed up with Counselor Langley on February 4, 2015. Tr. at 423. The counseling session focused on using cognitive behavioral therapy ("CBT") tools to explore boundaries with others and Plaintiff's difficulty with setting healthy boundaries. *Id.* Counselor Langley observed Plaintiff to present appropriately in the session and to demonstrate oriented and alert cognitive functioning, appropriate affect, euthymic mood, intact functional status, and interactive engagement. *Id.* She noted Plaintiff was progressing toward her treatment goals. Tr. at 424.

Counselor Langley described Plaintiff as oriented and alert, having appropriate affect and euthymic mood, being interactive, and showing intact functional status on February 9, 2015. Tr. at 421. She worked with Plaintiff

on using CBT tools to explore boundaries with others. *Id.* She noted Plaintiff was progressing toward her treatment goals. Tr. at 422.

Counselor Langley described Plaintiff as oriented and alert, demonstrating constricted affect and euthymic mood, being interactive, and having intact functional status on March 4, 2015. Tr. at 419. She worked with Plaintiff on exploring boundaries with her father, ex-husband, and daughter. *Id.* She indicated Plaintiff was progressing toward her treatment goal. Tr. at 420.

Plaintiff failed to attend an appointment with Counselor Langley on March 16, 2015. Tr. at 418.

Counselor Langley noted Plaintiff was alert and oriented, had appropriate affect and euthymic mood, was interactive, and had intact functional status on March 23, 2015. Tr. at 416. Plaintiff reported feeling better overall, but being tired and tearful at times. *Id.* Counselor Langley worked with Plaintiff on coping skills to deal with her daughter's mental illness. Tr. at 416–17.

Counselor Langley described Plaintiff as having oriented and alert cognitive functioning, appropriate affect, euthymic mood, interactive interpersonal abilities, and intact functional status on April 1, 2015. Tr. at 414. She noted Plaintiff presented appropriately during the session. *Id.* She worked with Plaintiff on strategies to establish boundaries with her aunt and

her aunt's children. *Id.* She indicated Plaintiff was progressing toward her goal. Tr. at 415.

Counselor Langley declined to complete a medical opinion form on April 27, 2015, noting she had only seen Plaintiff four times and considered it more appropriate for her physician or psychiatrist to complete the form. Tr. at 428.

Plaintiff presented appropriately during a psychotherapy session with Counselor Langley on April 29, 2015. Tr. at 693. She reported having recently gone on dates with a male friend. *Id.* She worked with Counselor Langley on setting appropriate boundaries with her daughter, and they explored her anxiety over attending a court hearing related to a discrimination claim against her former employer. *Id.*

Counselor Langley terminated Plaintiff's treatment on June 1, 2015, after Plaintiff reported she would be moving and declined to make subsequent contact. Tr. at 690.

Plaintiff presented to Mary E. Byrd, NP ("NP Byrd"), to establish treatment on June 10, 2015. Tr. at 517. She indicated her prior physician had removed her from work because of her anxiety and panic attacks. *Id.* She requested medication refills. *Id.* NP Byrd noted normal findings on exam. Tr. at 518. She prescribed Prozac 40 mg for anxiety, Hydroxyzine HCl 50 mg for insomnia, and Levothyroxine Sodium 100 mcg for hypothyroidism. *Id.* She indicated she would authorize a three-month period of temporary disability,

but would not extend it again, as Plaintiff needed to try to "go back partially" to her job or to transfer to a less stressful job. Tr. at 519.

Plaintiff presented appropriately during a psychotherapy session on June 25, 2015. Tr. at 688. She reported having recently moved to a new apartment with her children. *Id.* She worked with Counselor Langley on difficulties with her daughter's lack of motivation and setting boundaries with her ex-husband. *Id.*

Counselor Langley indicated Plaintiff presented appropriately in a session on July 7, 2015. Tr. at 684. She explored Plaintiff's frustration with her daughter's lack of energy and motivation and encouraged Plaintiff to set better boundaries with her boyfriend. *Id.*

On August 10, 2015, Plaintiff reported feeling down due to limited resources and her daughter's increased mental health symptoms. Tr. at 681. She indicated she was afraid to leave her daughter alone. *Id.* Counselor Langley observed Plaintiff to demonstrate a depressed mood, but noted otherwise normal findings on a mental status exam ("MSE"). *Id.*

Plaintiff presented to consultative examiner Douglas R. Ritz, Ph.D. ("Dr. Ritz"), for an MSE on August 15, 2015. Tr. at 429. She reported she stopped working in November 2014, following a mental breakdown. *Id.* She described episodes of dizziness, shortness of breath, and paranoia that occurred while she was working. *Id.* She said she had difficulty breathing and

focusing any time she felt stressed or worried. *Id.* She admitted her medication had reduced her worry, but indicated she continued to have some paranoia. *Id.* She said she completed household chores with her son's assistance, cared for her personal grooming, shopped for groceries, and socialized with immediate family. Tr. at 430.

Dr. Ritz described Plaintiff as having good grooming and hygiene, maintaining eye contact, speaking in a low tone, having anxious mood, and demonstrating incongruent affect at times. *Id.* He indicated Plaintiff demonstrated coherent, logical, and goal-directed thoughts. Tr. at 431. He noted Plaintiff was alert, responsive, and in mild distress. *Id.* He stated Plaintiff had no auditory or visual hallucinations or delusions and showed fair insight and judgment. *Id.* Plaintiff obtained a score of 25 of 30 on a Mini-Mental State Exam ("MMSE"), which was in the unimpaired range. *Id.* Plaintiff showed difficulty remembering the date and Dr. Ritz's office address. *Id.* She recalled two of three words after a brief delay. *Id.* She was reluctant to complete serial sevens, claiming she could not focus, but successfully completed the task. *Id.* She repeated a nine-word sentence, but did not correctly point to figures in a directed order. *Id.* Dr. Ritz estimated Plaintiff had average cognitive skills. *Id.* He wrote the following:

> [Plaintiff] has a generalized level of anxiety that would not necessarily prevent her from performing in a work-related setting. Despite numerous statements about inability to focus for the most part, she was able to sustain that especially during the

> Mini-Mental Status tasks. She does most all of the household chores with help from her son. She takes care of her personal grooming consistently. She has limited social interactions, but does go grocery shopping. She is able to handle funds and avoid physical danger. It is also interesting to note that her counselor diagnosed her with an adjustment disorder and not panic disorder.

*Id.* Dr. Ritz diagnosed generalized anxiety disorder and adjustment disorder with depressed mood. *Id.*

On August 18, 2015, state agency medical consultant George T. Keller, III, M.D. ("Dr. Keller"), noted Plaintiff had alleged no physical impairments and that evidence in the record reflected only a history of uterine fibroids and hypothyroidism. Tr. at 98, 108. He concluded Plaintiff's physical impairments were non-severe. *Id.*

On August 24, 2015, state agency consultant Camilla Tezza, Ph.D. ("Dr. Tezza"), reviewed the evidence and considered Listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 99–100, 109–10. She assessed no episodes of decompensation, mild restriction of activities of daily living ("ADLs"), and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. *Id.* She evaluated Plaintiff's mental residual functional capacity ("RFC"), considering her moderately limited in her abilities to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and

workweek without interruption from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 100–02, 110–12. She expected that Plaintiff could: (1) understand, remember, and carry out simple instructions; (2) understand and remember detailed instructions, but may have difficulty carrying them out; (3) maintain attention and concentration for two hour blocks of time throughout a regular work day; (4) tolerate and work cooperatively with others, but may perform better if substantial interaction with coworkers is not required; (5) accept feedback from supervisors; (6) perform better if not required to interact much with the public; (7) sustain an ordinary routine without special supervision; (8) may miss an occasional day or half-day of work due to psychological symptoms or need to attend mental health appointments; and (9) attend work regularly and avoid workplace hazards. Tr. at 102, 112.

Plaintiff cancelled an appointment with Counselor Langley on September 2, 2015. Tr. at 680. She reported she had injured her back and planned to visit a doctor. *Id.*

Plaintiff presented to the emergency room ("ER") at McLeod Regional Medical Center on September 3, 2015, with a complaint of right lower

quadrant abdominal pain that radiated to her right lower back. Tr. at 460. She was diagnosed with an ovarian cyst and a urinary tract infection. Tr. at 472.

Plaintiff complained of feeling anxious on September 10, 2015. Tr. at 678. She reported difficulty setting boundaries with her ex-husband and daughter and guilt over her son living away from her. *Id.* Counselor Langley described Plaintiff as having an anxious mood, but indicated otherwise normal findings on MSE. *Id.*

Plaintiff reported feeling a bit better during a psychotherapy session September 16, 2015. Tr. at 676. Counselor Langley observed her to be alert and oriented, to demonstrate euthymic mood, to have intact functional status, to show appropriate affect, and to be interactive. *Id.* She worked with Plaintiff on setting boundaries with her ex-husband, daughter, and son's girlfriend. *Id.*

On September 24, 2015, Counselor Langley observed the following on MSE: oriented and alert cognitive functioning; euthymic mood; intact functional status; appropriate affect; and interactive presentation. Tr. at 674. She focused her session on exploring triggers for Plaintiff's anxiety and discussing options for Plaintiff to regain self-control. *Id.*

Plaintiff complained of low back pain on October 1, 2015. Tr. at 511. She denied radiation, numbness, and tingling and indicated her pain was

worsened by movement. *Id.* Richard P. Haire, PA ("PA Haire"), observed Plaintiff to be obese and to have limited range of motion ("ROM") of the back and tenderness of the thoracic and lumbar spines with paraspinal tenderness. Tr. at 512. He prescribed Tramadol 50 mg and Flexeril 10 mg and referred Plaintiff to physical and occupational therapy. *Id.*

Plaintiff presented to psychiatrist Robert Engelman, M.D. ("Dr. Engelman"), for treatment of anxiety on November 13, 2015. Tr. at 502. She reported a five-year history of anxiety that had been increasing over the prior three months and depression that had been increasing over the prior six months. *Id.* She indicated her depression and anxiety were worsened by stressors, but noted she had minimal improvement when the stressors were decreased. *Id.* She reported Prozac provided some relief. *Id.* Plaintiff endorsed the following symptoms: depression, irritability, fatigue, anxiety, panic attacks occurring once a month, low attention, easy distraction, careless mistakes, forgetfulness, trouble falling and staying asleep, and history of physical abuse. Tr. at 502–03. She endorsed a history of hypothyroidism, but indicated no other symptoms on an ROS. Tr. at 503. Dr. Engelman observed the following: normal general appearance; normal muscle tone; normal gait; normal motor activity; inattentiveness; variable concentration; average intellect, normal fund of knowledge; oriented times five; normal recall; normal speech flow; normal eye contact; normal facial expression; depressed

mood; appropriate affect; appropriate thought content; logical organization; normal judgment; realistic reality testing; normal insight; normal decision making; and normal social judgment. Tr. at 503–04. He diagnosed anxiety disorder, not otherwise specified ("NOS"), and major depressive disorder, recurrent. Tr. at 504. He continued Prozac 40 mg daily and prescribed Wellbutrin SR 150 mg and Vistaril 50 mg. *Id.*

Plaintiff also followed up with PA Haire on November 13, 2015. Tr. at 509. She endorsed anxiety and depression, but denied suicidal ideation and indicated she was able to maintain relationships and that her symptoms did not interfere with her ADLs. *Id.* She endorsed good mood and denied crying spells, panic, and isolation. *Id.* She complained of back and left shoulder pain and indicated she had not attended physical therapy because of an insurance change. *Id.* She noted Tramadol was helpful. *Id.* PA Haire observed Plaintiff to be overweight, to demonstrate normal mood and affect, to have normal musculoskeletal strength and tone, to have full, painful ROM of the left shoulder with posterior and anterior tenderness, to demonstrate normal gait, and to show full, but mildly painful ROM of the back with tenderness in the lumbar spine and paraspinals. Tr. at 509–10. He prescribed Lisinopril/Hydrochlorothiazide for hypertension, continued Tramadol and Flexeril for back pain, ordered lab work for hypothyroidism, and provided physical therapy referrals for Plaintiff's back and left shoulder. *Id.*

Plaintiff presented to Dennis R. Finley, PT ("PT Finley"), for an initial evaluation on December 1, 2015. Tr. at 526. She described low back pain. *Id.* She endorsed no limitation as to walking and sitting, mild limitation as to recreational exercise, and moderate limitation as to standing. *Id.* She demonstrated 4-/5 gross strength to flexion, extension, bilateral side bending, and bilateral rotation of the lumbar spine. Tr. at 527. Her lumbar active ROM was to 60 degrees of flexion, 15 degrees of extension, 25 degrees of right side bending, 20 degrees of left side bending, and 50 degrees of left and right rotation. *Id.* She demonstrated normal sensation and reflexes. Tr. at 527–28. She was tender to light palpation in her bilateral lower lumbar paraspinals. Tr. at 528. PT Finley recommended Plaintiff engage in physical therapy sessions three times a week for four weeks. Tr. at 528. He subsequently discharged Plaintiff from physical therapy on December 9, 2015, after she failed to return calls or attend appointments. Tr. at 523.

Counselor Langley terminated Plaintiff's psychotherapy services on December 28, 2015, after she failed to make contact in over 90 days. Tr. at 671.

Plaintiff returned for psychotherapy on January 21, 2016. Tr. at 669. Counselor Langley observed Plaintiff to be alert and oriented, to have euthymic mood and intact functional status, to demonstrate appropriate affect, and to be interactive. *Id.* She focused the therapy session on positive

factors in Plaintiff's life, as her children were doing well and she had made progress in a legal case against her former employer. *Id.* She explored Plaintiff's hesitation to return to work and problems in her romantic relationships. *Id.*

Plaintiff failed to attend a scheduled appointment with Counselor Langley on February 3, 2016. Tr. at 667.

On February 8, 2016, Plaintiff reported decreased depression and denied adverse reaction with the addition of Wellbutrin. Tr. at 728. She endorsed mild, but tolerable depression and reduced and more manageable anxiety. *Id.* She complained of difficulty falling and staying asleep with persistent and bothersome daytime tiredness. *Id.* She felt as if Vistaril had become less effective. *Id.* Dr. Engleman observed inattentiveness, anxious facial expression, dysthymic mood, and some gaps in insight, but also noted intact orientation, appropriate affect and thought content, and normal motor activity, concentration, fund of knowledge, recall, speech flow, eye contact, organization, judgment, reality testing, decision making, and social judgment. Tr. at 729–30. He prescribed Trazodone 50 mg for sleep and continued Plaintiff's other medications. Tr. at 730.

Counselor Langley terminated psychotherapy on April 13, 2016, after Plaintiff had made no contact for several months. Tr. at 666.

On May 23, 2016, state agency medical consultant Timothy Laskis, Ph.D. ("Dr. Laskis"), reviewed the evidence and considered Listings 12.04 and 12.06. Tr. at 126–28. He assessed the same degree of limitation in each area as Dr. Tezza and provided the same mental RFC. *Compare* Tr. at 99–100, 100–02, 109–10, 110–12, with Tr. at 126–28, 131–32, 142–44, 147–48.

Also on May 23, 2016, state agency medical consultant Sherrial Simmers, M.D. ("Dr. Simmers"), reviewed the evidence and provided the following physical RFC assessment: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently stoop; unlimited in other postural movements; and frequently reach with the left upper extremity. Tr. at 129–30, 145–46.

Plaintiff returned to Counselor Langley on July 27, 2016, and reported increased anxiety as a result of her son's negative attitude. Tr. at 664. Counselor Langley described the following on MSE: appropriate dress and general appearance; unremarkable motor activity; fair insight and judgment; appropriate affect; euthymic mood; oriented to person, place, and time; intact memory; good attention/concentration; appropriate thought content; unremarkable perception and flow of thought; appropriate interview behavior; and normal speech. *Id.*

Plaintiff complained of tiredness and requested her thyroid function be checked on September 16, 2016. Tr. at 731. Toney Graham, Jr., M.D. ("Dr. Graham"), ordered a complete blood count, a thyroid panel, and a complete metabolic panel. *Id.* He assessed anxiety, increased blood pressure, and decreased thyroid function. *Id.* He prescribed Lisinopril 10 mg, Synthroid 100 mg, and Prozac 20 mg. Tr. at 732.

On September 22, 2016, Plaintiff presented to PA Haire for a routine visit. Tr. at 607. She reported a multi-year history of back and bilateral foot pain and indicated she was disabled by depression and anxiety. *Id.* She noted her depression and anxiety were stable with medications and did not report fatigue. *Id.* PA Haire observed Plaintiff to be overweight, to show normal mood and affect, to have normal motor strength and tone, to move all extremities normally, to demonstrate normal gait, and to have full, but mildly painful ROM of the back with tenderness in the lumbar spine and paraspinals. Tr. at 608. He discussed abnormal lab test results, including elevated thyroid-stimulating hormone ("TSH") and high cholesterol. Tr. at 608–09. He referred Plaintiff to an orthopedist for low back pain. Tr. at 609.

Plaintiff also followed up with Counselor Langley on September 22, 2016. Tr. at 661. She reported feeling frustrated with and worried about her son. *Id.* She indicated she had missed prior sessions because of transportation issues, but would be able to attend sessions more regularly because her son

had acquired his own vehicle. *Id.* She stated she was unable to return to work until her daughter's mental health was more stable. *Id.* However, she also said she was considering returning to school for psychology after her daughter started technical college in January. *Id.* Counselor Langley observed the following: oriented and alert cognitive functioning; appropriate and interactive presentation; agreeable and euthymic mood; intact functional status; and appropriate affect. *Id.*

On September 22, 2016, Plaintiff also visited Dr. Engleman for medication management. Tr. at 725. She endorsed mild depression and anxiety that were more manageable overall. *Id.* She noted her depression and anxiety were variable and highly influenced by her daughter's mood and mental health stability. *Id.* She reported Trazodone was benefitting her sleep without causing significant morning grogginess. *Id.* She indicated her sleep was more satisfactory, although she continued to wake frequently during the night. *Id.* Dr. Engleman observed inattentiveness, dysthymic mood, and gaps in insight, but average intellect, intact orientation, appropriate affect and thought content, and normal concentration, fund of knowledge, recall, eye contact, speech flow, organization, judgment, reality testing, decision making, and social judgment. Tr. at 726–27. He continued Plaintiff's medications. Tr. at 727.

Plaintiff reported feeling better overall and was very agreeable on October 4, 2016. Tr. at 659. She indicated she had recently realized that she needed to stop enabling her son. *Id.* Counselor Langley encouraged Plaintiff to continue to use coping skills. Tr. at 660.

On October 18, 2016, Plaintiff reported feeling stressed and sad, and Counselor Langley noted she was intermittently tearful. Tr. at 656. She indicated her son had recently been disrespectful to her. *Id.* Counselor Langley encouraged Plaintiff to use CBT tools to process unhelpful thinking patterns and behaviors. *Id.*

Plaintiff presented for routine follow up on October 20, 2016. Tr. at 604. She endorsed hypertension, back pain, bilateral foot pain, hypothyroidism, and stable anxiety and depression on an ROS. *Id.* She denied fatigue. *Id.* PA Haire observed Plaintiff to be overweight, to have normal mood and affect, to show normal musculoskeletal strength and tone, to move all extremities normally, to demonstrate normal gait, and to have full, but painful ROM of the back with tenderness in the lumbar spine and paraspinals. Tr. at 605. PA Haire discussed Plaintiff's most recent lab work. Tr. at 605–06. He increased Levothyroxine to 137 mcg to address an elevated TSH level. Tr. at 606.

Plaintiff presented to orthopedist Chadley M. Runyan, M.D. ("Dr. Runyan"), for an initial examination on October 25, 2016. Tr. at 626. She complained of bilateral foot pain that was worse on the left than the right. *Id.*

She complained of the following on an ROS: thyroid problems, chills, fatigue, tiredness, fever, generalized pain, joint swelling/stiffness, leg cramps, muscle aches and weakness, chronic headaches, dizziness, depression, and panic attacks. *Id.* She was 5'6" tall, weighed 247 pounds, and had a BMI of 39.9 kg/m.[2] *Id.* Dr. Runyan noted standing cavus deformity in the bilateral feet, diffuse tenderness over the anterior mortise on the left, bilateral peroneal and posterior tibial tenderness, intact bilateral ankle/subtalar ROM, painful subtalar ROM on the left, tenderness of both sinus tarsi, intact distal pulses, no significant edema, slight left antalgic gait, and intact distal neurovascular exam. Tr. at 627. He reviewed x-rays of Plaintiff's feet that showed mild midfoot degenerative changes on the left. *Id.* He diagnosed bilateral cavus foot and bilateral ankle/foot tendinitis. *Id.* He prescribed Mobic 7.5 mg and recommended derotational arch supports and compression stocking. *Id.*

On November 1, 2016, Plaintiff complained of intermittent low back pain that was related to activity. Tr. at 624. She reported her pain occasionally radiated below her knees. *Id.* She endorsed thyroid problems, chills, fatigue, tiredness, generalized pain, joint swelling/stiffness, leg cramps, muscle aches and weakness, chronic headaches, dizziness, depression, and panic attacks on an ROS. *Id.* Dr. Runyan observed tenderness in the midline of the lumbar spine, paraspinals, and bilateral sacroiliac ("SI") joints. Tr. at 625. He noted functional bilateral hip motion,

normal motor and sensory exam, full and equal strength, normal lower extremity reflexes and tone, normal gait, and bilateral standing cavus foot deformities. *Id.* He stated x-rays of the lumbar spine showed moderate degenerative changes to the L5–S1 discs. *Id.* He diagnosed bilateral cavus foot, lumbar degenerative disc disease ("DDD"), and lumbar radiculopathy. *Id.* He prescribed a Medrol Dosepak, Mobic 15 mg, and Tizanidine 2 mg. *Id.* He recommended cavus arch supports and physical therapy and directed Plaintiff to follow up in six weeks. *Id.*

Counselor Langley discharged Plaintiff from therapy on November 23, 2016. Tr. at 652. She noted Plaintiff requested a break in service because of insurance issues and had made progress on her goals with improved use of coping skills and setting healthy boundaries with others. *Id.*

On December 13, 2016, Plaintiff reported less frequent sleep disturbance and more satisfactory sleep. Tr. at 722. She endorsed mild, variable depression and variable anxiety and indicated both were manageable. *Id.* Dr. Engleman noted inattentiveness, normal concentration, dysthymic mood, appropriate thought content and affect, normal organization, normal judgment, normal decision making, and gaps in insight. Tr. at 723–24. He continued Plaintiff's medications. Tr. at 724.

Plaintiff followed up with PA Haire for hypertension and hypothyroidism on January 19, 2017. Tr. at 602. She endorsed hypertension,

back pain, bilateral foot pain, and hypothyroidism and noted depression and anxiety were stable with medications. *Id.* She reported no fatigue. *Id.* PA Haire observed Plaintiff to be overweight and to demonstrate full, but mildly painful ROM of the back with tenderness in the lumbar spine and paraspinals. Tr. at 602–03. He noted normal mood and affect, normal motor strength and tone, normal gait, and normal movement of all extremities. *Id.* He assessed anemia, hypothyroidism, hypertension, and vitamin D deficiency and increased Lisinopril-Hydrochlorothiazide to 20/12.5 mg. Tr. at 603.

Plaintiff reported no improvement in symptoms on February 28, 2017. Tr. at 622. She rated her pain as a seven and described lower back pain that radiated to both lower extremities. *Id.* Dr. Runyan observed equivocal straight-leg raise ("SLR") test in both lower extremities, maximal tenderness over the left SI joint and greater sciatic notch, no focal neurological weakness, intact sensation, normal lower extremity reflexes, and slight left antalgic gait. *Id.* He prescribed Tizanidine 2 mg and Tramadol 50 mg, indicating Plaintiff should take both three times daily, as needed for pain. Tr. at 623. He injected Plaintiff's left posterior sacrum with Lidocaine and Depo-Medrol and instructed her to continue with physical therapy and to follow up after magnetic resonance imaging ("MRI") of the lumbar spine. *Id.*

On March 1, 2017, Plaintiff reported having sustained a recent panic attack that caused her to feel overwhelmed, cry, and yell. Tr. at 649. She

reported difficulty following through and struggling with multiple stressors. *Id.* Counselor Langley observed the following on MSE: appropriate dress and general appearance; unremarkable motor activity; good insight and judgment; appropriate affect; euthymic mood; oriented to person, place, and time; intact memory; good attention/concentration; appropriate thought content; unremarkable perception and flow of thought; appropriate interview behavior; and normal speech. *Id.*

On March 9, 2017, Counselor Langley observed the following: alert and oriented cognitive functioning; euthymic mood; intact functional status, appropriate affect; and interactive interpersonal response. Tr. at 647. She recommended weekly CBT sessions focused on setting clear, healthy boundaries and decreasing anxiety symptoms. Tr. at 645.

On March 28, 2017, James Thesing, D.O. ("Dr. Thesing"), interpreted an MRI of Plaintiff's lumbar spine to show: (1) mild DDD and facet arthropathy at L4–5 with minimal central disc protrusion producing no neural impingement and mild bilateral neural formal stenosis; (2) mild DDD and moderate facet arthropathy at L5–S1 with central disc protrusion producing mild mass effect on the right S1 nerve root and moderate left and mild right neural foraminal stenosis; and (3) fibroid uterus. Tr. at 620.

Plaintiff reported improved leg and buttock pain on April 6, 2017. Tr. at 618. Dr. Runyan noted no significant interval change on focused exam. *Id.* He

prescribed Tramadol 50 mg three times a day, as needed for pain and recommended lumbar epidural steroid injections. Tr. at 619.

Counselor Langley discharged Plaintiff from services on April 24, 2017, after she failed to make contact for over 45 days. Tr. at 643.

Plaintiff followed up with Nancy Collins, M.D. ("Dr. Collins"), to discuss an ultrasound showing a stable uterine leiomyoma on May 11, 2017. Tr. at 629. Dr. Collins encouraged Plaintiff to restart her medication despite her denial of heavy bleeding. *Id.* She assessed iron deficiency anemia and advised Plaintiff to continue to take an iron supplement. *Id.* She referred Plaintiff for an ultrasound of the left breast given an abnormal mammogram. *Id.*

Plaintiff followed up with PA Haire for hypertension, iron deficiency anemia, and hypothyroidism on May 12, 2017. Tr. at 737. PA Haire noted Plaintiff's hemoglobin had improved a little, but her TSH level remained elevated despite use of Synthroid. *Id.* Plaintiff endorsed pain in her back and bilateral feet, stable anxiety with medications, and hypothyroidism. *Id.* She weighed 248 pounds and had a BMI of 38.8 kg/m.[2] *Id.* PA Haire observed Plaintiff to be overweight and to demonstrate full, but mildly painful ROM of the back with tenderness in the lumbar spine and paraspinals. Tr. at 737–38. He referred Plaintiff to a hematologist for anemia, prescribed a supplement for vitamin D deficiency, and increased Levothyroxine to 175 mcg. Tr. at 738.

Plaintiff returned to Counselor Langley for services on May 23, 2017. Tr. at 641. She reported feeling overwhelmed with stressors that included her daughter's mental illness, her boyfriend moving in two weeks prior, and a recent incident in which her ex-husband pulled a knife on her. *Id.* She endorsed feeling anxious, difficulty sleeping, intrusive thoughts, and being easily frustrated. *Id.* Counselor Langley observed the following on MSE: appropriate dress and general appearance; unremarkable motor activity; good insight and judgment; euthymic mood; appropriate affect; oriented to person, place, and time; intact memory; good attention/concentration; appropriate thought content; unremarkable perception and flow of thought; appropriate interview behavior; and normal speech. Tr. at 641. Plaintiff set goals with Counselor Langley to decrease anxiety symptoms and set clear, healthy boundaries with others. Tr. at 639.

On June 3, 2017, Plaintiff complained that Wellbutrin increased her anxiety, as she felt her anxiety was decreased on days when she did not take it. Tr. at 719. She reported her depression was variable, but manageable. *Id.* She endorsed increasing tiredness during the day, despite stable sleep. *Id.* She indicated her concentration had been poor for five years or greater, but was becoming less tolerable and affecting her ADLs. *Id.* She endorsed low attention, easy frustration, easy distraction, careless mistakes, forgetfulness, poor task completion, and poor organization ability. *Id.* Dr. Engleman noted

inattentiveness, variable concentration, dysthymic mood, and gaps in insight on an MSE. Tr. at 720–21. He diagnosed attention deficit disorder ("ADD"), in addition to Plaintiff's other diagnoses. Tr. at 721. He stopped Wellbutrin, added Adderall 10 mg twice a day, and continued Prozac 40 mg, Trazodone 50 mg, and Vistaril 50 mg. *Id.*

On August 16, 2017, Plaintiff reported her attention had improved, but her anxiety had increased with the addition of Adderall 10 mg. Tr. at 716. She endorsed decreased anxiety and increased attention upon decreasing Adderall to 5 mg twice daily, but described decreased attentiveness as her medication wore off. *Id.* She endorsed mild depression that was improved and overall manageable and variable anxiety that was tolerable with treatment. *Id.* She indicated she required Trazodone to initiate sleep, but her sleep was otherwise stable. *Id.* Dr. Engleman noted inattentiveness, variable concentration, dysthymic mood, and gaps in insight, but noted otherwise normal findings on an MSE. Tr. at 717–18. He indicated Plaintiff should take Adderall 5 mg twice a day and continued her other medications. Tr. at 718.

Counselor Langley terminated treatment on August 28, 2017. Tr. at 636.

On October 16, 2017, Plaintiff reported variable anxiety and tolerable depression that had improved from her baseline. Tr. at 713. She indicated her attention was stable and improved and that she was tolerating Adderall well.

28

*Id.* She described her sleep as variable, but stable and mostly sufficient. *Id.* Dr. Engleman noted inattentiveness, variable concentration, dysthymic mood, and gaps in insight, but otherwise normal mental status. Tr. at 714–15. He continued Plaintiff's medications. Tr. at 715.

On January 9, 2018, Plaintiff reported variable anxiety that was improved from her baseline and depression that was improved from her baseline and mildly tolerable. Tr. at 708. She endorsed variable sleep that was stable and mostly sufficient and stable and improved attention that permitted her to accomplish daily tasks. *Id.* Dr. Engleman noted normal findings on an MSE, aside from inattentiveness, variable concentration, dysthymic mood, and gaps in insight. Tr. at 711–12. He continued Plaintiff's medications. Tr. at 712.

Plaintiff presented to Donna Smyth, FNP ("NP Smyth"), as a new patient on February 26, 2018. Tr. at 700. She complained of night sweats, right lower quadrant abdominal pain, occasional chest pain, and some difficulty breathing upon exertion. *Id.* She weighed 269 pounds and had a BMI of 43.4 kg/m.[2] Tr. at 701. NP Smyth observed trace ankle edema and right lower quadrant tenderness to palpation. Tr. at 702. She assessed essential hypertension, hypothyroidism, symptomatic premature menopause, dysfunctional uterine bleeding, constipation, generalized anxiety disorder, moderate recurrent major depression, attention-deficit hyperactivity disorder

("ADHD"), and morbid obesity due to excess calories. *Id.* She ordered lab work and prescribed Levothyroxine 100 mcg. Tr. at 703. Plaintiff's lab work showed below normal hemoglobin, elevated serum glucose, and several other abnormalities. Tr. at 704–06.

On March 6, 2018, Plaintiff reported variable anxiety, but noted it was improved from her baseline and tolerable. Tr. at 707. She endorsed increased stressors related to her finances and her daughter's health. *Id.* She stated her depression was somewhat increased, but tolerable. *Id.* She noted her concentration continued to improve and that she continued to tolerate Adderall well. *Id.* She endorsed variable, but stable, and mostly sufficient sleep. *Id.* Dr. Engleman noted normal findings on an MSE, aside from inattentiveness, variable concentration, dysthymic mood, and gaps in insight. Tr. at 708–09. He continued Plaintiff's medication. Tr. at 709.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on June 20, 2018, Plaintiff testified her prior work as a yarn machine operator required pulling five or 10 pounds of yarn out of a machine and sometimes lifting 50-pound bales of yarn. Tr. at 45–48. She said she worked on her feet all day as a cashier/floater in several places, as a substitute teacher for kindergarten to twelfth grade, and as a reservationist

for CondoLux and Plantation Resort. Tr. at 49–50. She explained her self-employment earnings from 2015 to 2017 were for supervising her 17-year-old son as he babysat a cousin's three children after school in their home. Tr. at 51–54. She indicated she represented to the state that she was keeping the children because her son was too young to qualify to provide care through the ABC program. Tr. at 54–55. She said she watched the children for brief periods while her son went to the restroom or to get things for the children. Tr. at 53. She testified she had not received pay for any work since 2017. Tr. at 55.

Plaintiff testified she was right-handed, 5'6" tall, and weighed 264 pounds. Tr. at 55–56. She indicated her weight had increased due to being unable to move around and hyperthyroidism, which interfered with her metabolism. Tr. at 56. She stated she had been unable to afford medication after she lost Medicaid in August of the prior year when her son aged out. Tr. at 56–59. She said she visited Little River Medical, a low-cost clinic that charged $60 per visit and an additional $25 for her medication. Tr. at 56–57. She acknowledged having received a six-month prescription for her thyroid medication in February, but said she had other prescriptions that she could not afford. Tr. at 58–59. The ALJ confirmed Plaintiff had been prescribed Hydrochlorothiazide, Adderall, Cyclobenzaprine, Hydroxyzine, Prozac, and Tramadol, but that she was only able to obtain her thyroid and blood

pressure medicines. Tr. at 60–61. Plaintiff testified that her daughter, who qualified for Medicaid, shared her Prozac, resulting in each of them taking a half-dose of the medication. Tr. at 61. She stated she had filled her prescription for her thyroid medication late because she could not afford it. Tr. at 59. She said she had previously been on increasing doses of thyroid medication and was failing to improve because she could not get the right amount of medication at the right time. Tr. at 62. She said she experienced menstrual bleeding for a month or two at a time and had developed anemia because she could not afford birth control pills. Tr. at 62–63. However, she subsequently acknowledged that she was recently able to obtain free birth control pills from the clinic. Tr. at 63. She testified that when she was able to take her medications, she felt better mentally, but not physically, as her feet and back problems continued. Tr. at 64–65.

Plaintiff testified she was not married and lived in a low-income apartment with her schizophrenic daughter, 22, and her son, 19. Tr. at 65–66. She said seeing her counselor helped her to better cope with her schizophrenic daughter, but she was unable to see her counselor since she lost Medicaid. Tr. at 66–67. Plaintiff testified her daughter was back on Risperidone, but was very needy, like a little kid. Tr. at 67–68.

Plaintiff testified she had a driver's license and drove regularly, although she preferred not to drive because of anxiety and pain in her back

and feet. Tr. at 68. She said she could drive for 30 to 45 minutes at a time. *Id.* She admitted she drove an hour to the hearing, but stopped after 30 minutes at the Hot Spot to get out of the car, walk around, stretch her legs, and prop her feet up in the back seat. Tr. at 68–69. She said her daughter rode with her. Tr. at 69.

She testified she obtained a Bachelor of Arts degree in history and had no further specialized training or certifications. *Id.*

Plaintiff testified that she attended church two of four Sundays a month, and did not attend the other days due to problems with her back and foot, such that she would leave after the sermon, approximately 30 minutes into the service. Tr. at 70–71. She denied staying for the meal after the service. Tr. at 71–72. She said she rarely went anywhere due to her anxiety. Tr. at 72. She described putting her feet up, soaking her feet, and placing a heating pad on her back to be more comfortable in her recliner while at home. *Id.* She said her back pain felt like a nail hammered in the middle of her back. *Id.* She stated she could not afford the injections her doctor suggested because she lost Medicaid. *Id.* She said she could not wear shoes other than flip flops. Tr. at 73. She stated her doctor told her high blood pressure might be causing her feet problems and swelling. Tr. at 74–75. She reported her blood pressure medication caused her to go to the bathroom every hour. Tr. at 75. She acknowledged having been told to watch her diet and said she cut out

rice and fried foods, drank mostly water and unsweetened tea, and ate more fruits and vegetables. Tr. at 75–76. She reported hair loss. Tr. at 76.

Plaintiff estimated being able to sit for 30 minutes before needing to stand and being able to stand for 20 to 30 minutes before needing to sit again. *Id.* She estimated being able to walk for half a mile before needing to take a break, which she reported was sometimes good for her back. *Id.* She said she walked half a mile twice a week. *Id.* She stated her back hurt worse on some days than others, but not because of having walked. Tr. at 77–78. She rated her worst back pain as an eight and her moderate and good days as sixes. Tr. at 78.

In response to questions from her counsel, Plaintiff testified she propped up her feet three times a day for 30 minutes at a time. Tr. at 79. She denied taking medication for pain, including over-the-counter medications, because she could not afford them, and relied on a heating pad exclusively to treat her pain. *Id.* She said she was able to perform self-care functions, but that they took "way longer" than they had in the past. Tr. at 80. She stated it took her an hour to engage in self-care, but had previously taken only 10 to 20 minutes. *Id.*

Plaintiff described a typical day as supervising her daughter, making sure she was properly dressed and not behaving erratically. Tr. at 80. She said she soaked her feet for half the day, used a heating pad, and watched

34

television. Tr. at 81. She said she could watch 30 minutes of Kung Fu, but could not watch an hour-long show due to pain and her mind drifting. *Id.* She said she tried to read for 30 minutes at a time, but sometimes could not focus and forgot what she read, such that she would read the same thing over and over again to get the story. Tr. at 81–82. Plaintiff said her son and daughter performed the housework, laundry, and cooking, and she sometimes helped her son to prepare foods. Tr. at 82. She stated she was no longer capable of cooking large meals. *Id.*

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur F. Schmitt, Ph.D., reviewed the record and testified at the hearing. Tr. at 84–93. The VE categorized Plaintiff's PRW as a cashier as semiskilled, light, specific vocational preparation ("SVP") of 3 *Dictionary of Occupational Titles ("DOT")* number 211.462-013; a hotel reservationist, skilled, sedentary, SVP of 5, *DOT* number 238.362-014; a teacher's aide, skilled, light, SVP of 6, *DOT* number 099.327-010; and a yarn machine operator, semiskilled, light, but medium as performed, SVP of 3, *DOT* number 681.685-058. Tr. at 85–86.

The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform the full range of light work, except could never lift or carry more than 10 pounds occasionally or frequently; alternate between sitting/standing and standing/sitting at the work station while completing

the task at hand every 30 minutes for up to five minutes; never operate foot controls; occasionally climb ramps and stairs, stoop, crouch, and kneel; never crawl or climb ladders, ropes, or scaffolds; occasionally reach overhead and be exposed to extreme cold, extreme heat, and vibration; never be exposed to dangerous chemicals, unprotected heights, or open, moving mechanical parts and hazardous machinery; concentrate sufficiently in two-hour increments to perform simple, routine tasks, but not at a production rate pace; make simple work-related decisions; and occasionally interact with supervisors, coworkers, and the public. Tr. at 86–87. The VE testified the hypothetical individual could not perform Plaintiff's PRW. Tr. at 87. The ALJ asked whether there were any other jobs the hypothetical person could perform. *Id.* The VE identified the following unskilled, light positions, with SVP of 2: storage facility clerk, *DOT* number 295.367-026; coupon redemption clerk, *DOT* number 290.177-010; and tobacco sampler, *DOT* number 529.587-022, with 460,000, 14,700, and 430,000 positions available nationally, respectively. Tr. at 87–88.

The VE testified the person would not be able to perform any job in the national economy if she were off-task for 20% of the eight-hour workday in addition to normal breaks or if she were to miss two or more days of work per month due to symptoms. Tr. at 88. The VE stated his testimony was

consistent with the *DOT* and otherwise based on his experience and education. Tr. at 88–89.

In response to Plaintiff's counsel, the VE testified the individual would be unemployable if she needed to prop her feet up above waist-height three times a day for 30 minutes at a time. Tr. at 89. He stated the individual would be able work with the sit/stand option if she were only required to elevate her feet below waist-level. *Id.*

### 2.    The ALJ's Findings

In her decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.
2. The claimant has engaged in substantial gainful activity since November 14, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3. However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.
4. The claimant has the following severe impairments: adjustment disorder with mixed anxiety and depressed mood, generalized anxiety disorder, major depression, attention deficit hyperactivity disorder (ADHD), degenerative disc disease (DDD), and obesity (20 CFR 404.1520(c) and 416.920(c)).
5. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and

416.967(b) except the claimant must never lift more than 10 pounds. The claimant must also be allowed to alternate between sitting and standing as well as standing and sitting at the work station while completing the task at hand every 30 minutes for up to five minutes. The claimant must never operate foot controls. Due to postural limitations, the claimant may only occasionally stoop, crouch, kneel, and climb ramps and stairs, but she must never crawl or climb ladders, ropes, or scaffolds. The claimant may occasionally reach overhead; occasionally be exposed to extreme cold, extreme heat, and vibration; never be exposed to dangerous chemicals, unprotected heights, or open, moving mechanical parts and hazardous machinery. The claimant can concentrate sufficiently in two hour increments to perform simple, routine tasks, but not at a production rate pace; can make simple work related decisions; can occasionally interact with supervisors, coworkers, and the public.

7.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.   The claimant was born on April 2, 1973 and was 41 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

12.  The claimant has not been under a disability, as defined in the Social Security Act, from November 14, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 17–32.

38

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not assess her RFC in accordance with SSR 96-8p; and

2)    the ALJ failed to properly evaluate her treating physician's opinion.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting

"need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, she may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the

decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    RFC Assessment

Plaintiff argues the ALJ did not assess her RFC in accordance with SSR 96-8p because she failed to address all her impairments. [ECF No. 13 at 14–19]. She maintains the ALJ did not address side effects of her medications and did not consider the entire record in rejecting allegations as to fatigue. *Id.* at 16; ECF No. 22 at 1–2. She contends the ALJ erred in concluding no impairment supported her foot pain and in declining to address foot pain in the RFC assessment. *Id.* at 17–18. She claims the ALJ did not explain how the evidence supported a finding that she could perform light work with a sit/stand option every 30 minutes. *Id.* at 18–19. She asserts the ALJ failed to consider that she reduced her treatment because she was unable to pay for it. [ECF No. 22 at 5].

The Commissioner argues substantial evidence supports the ALJ's RFC assessment. [ECF No. 21 at 16]. He maintains the ALJ declined to include restrictions in the RFC assessment to address medication-related side effects because Plaintiff consistently denied side effects from her medications. *Id.* at 18. He contends the record failed to demonstrate that fatigue imposed any

significant functional limitations beyond those accommodated by provisions in the RFC assessment. *Id.* at 18–19. He claims the ALJ accommodated Plaintiff's foot pain in the RFC assessment, despite having determined that it was not a severe, medically-determinable impairment. *Id.* at 19–20. He asserts the ALJ explained her RFC assessment, noting evidence contrary to Plaintiff's testimony as to limitations imposed by her back pain. *Id.* at 20–21.

To properly assess a claimant's RFC, the ALJ must consider all the relevant evidence and account for all of the claimant's medically-determinable impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). She must determine the claimant's ability to perform work-related physical and mental functions on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *2 (1996). She must include as part of the RFC assessment a narrative discussion describing how all the relevant evidence supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* at *7. "Thus, a proper RFC analysis has three components: (1) evidence, (2) logical explanation, and (3) conclusion." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019).

The ALJ must explain how any material inconsistencies or ambiguities in the record were resolved. SSR 16-3p, 2016 WL 1119029, at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to

perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found Plaintiff's alleged onset date of November 14, 2014, was inconsistent with her certified earnings record that reflected earnings of $15,990.88 in 2014, $13,103.00 in 2015, and $10,159.00 in 2016. Tr. at 17–18. She credited the evidence in the certified earnings record over Plaintiff's testimony and found that Plaintiff was "not entitled to disability benefits from her alleged onset date until 2016." Tr. at 18. Although the ALJ considered the record from Plaintiff's alleged onset date going forward, she did so with an understanding that the claim should be denied at step one prior to 2016. *See* Tr. at 18.

She assessed an RFC that limited Plaintiff to a substantially-reduced range of light work. *See* Tr. at 21.

a.    Medication-Related Side Effects

Although Plaintiff reported fatigue during several treatment visits, Tr. at 402, 404, 502, 624, 626, the ALJ cited sufficient reasons for declining to impose additional restrictions related to fatigue or other medication-related side effects. She acknowledged Plaintiff's claim that she had problems focusing, Tr. at 22, but cited multiple treatment records in which she denied

fatigue and other side effects of medications. *See* Tr. at 23 (indicating Plaintiff denied "adverse side effects" from Prozac on January 21, 2015), 27 (indicating that on October 20, 2016 and January 19, 2017, Plaintiff "reported that her anxiety and depression were stable on medications without fatigue as a side effect"; noting Plaintiff reported depression and anxiety were "stable with meds" with no fatigue on August 18, 2017). In addition, she noted a lack of evidence of distractibility or impaired concentration, demonstrating that any fatigue Plaintiff experienced did not impose additional work-related limitations. *See* Tr. at 20 (stating "the record fails to show any mention of distractibility"), 25 (providing "Dr. Ritz noted some remarkable findings, but also with fair insight, full orientation, and she scored 25/30 during a Mini-Mental Status Examination (MMSE) (Exhibit 5F/3)" and concluded Plaintiff "was able to sustain focus during the examination despite statements reporting loss of focus," could "handle funds," and could "avoid danger"). The ALJ also specifically referenced Plaintiff's reports as to effectiveness and a lack of side effects from medications. Tr. at 26 (acknowledging Plaintiff's reports of "increased attention and manageable anxiety when the Adderall was limited to five milligrams (Exhibit 19F/10)" and "[s]table and improved attention" on January 9, 2018). She addressed evidence contrary to her conclusion, acknowledging Dr. Engleman's impression that Plaintiff's "medication side effects could include tiredness and anxiety," but noting his

records reflected reports of improved and tolerable symptoms. Tr. at 26. Given the foregoing, the ALJ addressed and resolved evidence as to fatigue and other alleged side effects of Plaintiff's medications, and substantial evidence supports her decision not to include additional restrictions.

### b.    Foot Pain

An ALJ's recognition of a single severe impairment at step two ensures that she will progress to additional steps in the evaluation process. "[A]ny error here became harmless when the ALJ reached the proper conclusion that [claimant] could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence." *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008). Consequently, this court has found no reversible error where ALJs erroneously considered impairments non-severe at step two, provided they considered the impairments in subsequent steps. *See Washington v. Astrue*, 698 F. Supp. 2d 562, 580 (D.S.C. 2010) (collecting cases); *Singleton v. Astrue*, C/A No. 9:08-1982-CMC, 2009 WL 1942191, at *3 (D.S.C. July 2, 2009).

Although the ALJ initially dismissed bilateral foot pain as a "non-medically determinable impairment," at step two, Tr. at 19, she acknowledged in explaining the RFC that x-rays showed mild degenerative findings and Dr. Runyan assessed bilateral cavus foot and recommended arch supports. Tr. at 27. She noted Plaintiff's testimony that she had problems

with her feet, including pain and swelling related to high blood pressure, and that she only wore comfortable shoes. Tr. at 22. She cited Plaintiff's testimony that she could "sit . . . for about 30 minutes, stand for 20 to 30 minutes, walk for half a mile, and she walks two days a week for exercise." *Id.* She indicated the RFC assessment accommodated Plaintiff's impairment-related limitations as reflected in her testimony and the record. Tr. at 29.

The ALJ appears to have addressed the pain in Plaintiff's bilateral feet in the RFC assessment, as she included a provision to alternate between sitting and standing and standing and sitting at the work station every 30 minutes for up to five minutes that is generally consistent with Plaintiff's self-reported abilities. *See* Tr. at 21, 22. Therefore, while the ALJ erred in failing to assess bilateral cavus foot and degenerative changes to the bilateral feet as severe at step two, her error was rendered harmless, as she considered the impairment in assessing Plaintiff's RFC.

c.    Ability to Perform a Reduced Range of Light Work

The ALJ thoroughly discussed evidence as to Plaintiff's DDD. She acknowledged Plaintiff complained of radiating lower back pain upon presentation to the ER in September 2015. Tr. at 25. She noted Plaintiff briefly presented for physical therapy for increased lower back pain in December 2015, but did not present for subsequent appointments. Tr. at 23. She stated Plaintiff was "repeatedly examined with mildly decreased lumbar

range of motion in her back and left shoulder with tenderness" and received prescriptions for Tramadol and Flexeril during visits to PA Haire. Tr. at 27. She pointed out that Plaintiff was "doing better" on follow up in August 2017. *Id.* The ALJ recognized that Plaintiff had evidence of mild degenerative findings and moderate degenerative changes at L5–S1 on x-ray in October 2016. *Id.* She noted that Dr. Runyan observed tenderness in the lumbar spine with normal gait and functional ROM, assessed lumbar DDD and lumbar radiculopathy, referred Plaintiff for physical therapy, and prescribed medications for pain management. *Id.* She stated Plaintiff underwent MRI in March 2017 that showed mild DDD and facet arthropathy at L4–5 with minimal disc protrusion and mild bilateral foraminal stenosis, mild-to-moderate facet arthropathy at L5–S1 with disc protraction and mild mass effect and mild-to-moderate right neural foraminal stenosis, and a fibroid uterus. *Id.* She indicated Plaintiff was treated with prescription medications and injection and reported improved leg and buttock pain. *Id.* She stated Plaintiff showed mostly normal findings on physical exam. *Id.*

The ALJ provided a thorough explanation to support her conclusion that Plaintiff's impairments limited her to a reduced range of light work. She stated the RFC for light work with no lifting over 10 pounds and an ability to alternate between sitting and standing and standing and sitting at the work station every 30 minutes for up to five minutes accommodated Plaintiff's

impairment-related limitations as reflected in the record. Tr. at 21, 29. She noted Plaintiff's ability to manage her self-care, live independently with her two children, drive up to 30 minutes, attend church, help with cooking, watch television, and read. Tr. at 29. She stated the record reflected Plaintiff was "capable of extensive activities, which are not consistent with her alleged complete debility." *Id.* She indicated she based the RFC assessment on Plaintiff's "testimony, as well as a review of the record." *Id.* She recounted Plaintiff's testimony that she could "sit . . . for about 30 minutes, stand for 20 to 30 minutes, walk for half a mile, and she walks two days a week for exercise." Tr. at 22. She discussed the state agency consultant's impression that Plaintiff could perform work at the medium exertional level, but noted records after May 23, 2016, when the last state agency consultant reviewed the evidence, suggested "greater limitations including the light exertional range as detailed in the functional capacity." Tr. at 29. She acknowledged x-ray evidence supported DDD as a severe impairment, but Plaintiff's pain allegations were "out of proportion with her actual objective medical evidence." Tr. at 30.

The ALJ credited evidence that Plaintiff's DDD and other impairments would limit her sitting, standing, and lifting abilities. She found the RFC for a reduced range of light work with a sit/stand option at 30-minute intervals best accommodated Plaintiff's self-reported abilities to the extent they were

consistent with the other evidence. Substantial evidence supports the ALJ's RFC assessment, as she cited specific evidence and thoroughly supported her conclusion.

### d.    Inability to Afford Treatment

The record does not support Plaintiff's argument that the ALJ did not consider her financial struggles. The ALJ referenced Plaintiff's testimony that she was unable to afford shots for her back and her report that she declined to attend physical therapy because of an insurance charge. Tr. at 22, 27. Although the ALJ cited Plaintiff's noncompliance as a reason for finding her statements were not fully supported by the record, she referenced noncompliance that was not related to Plaintiff's financial position. She wrote the following:

> While the undersigned gives claimant some latitude, given her alleged financial constraints, the claimant repeatedly missed appointments for PT and counseling without contacting her treatment providers (Exhibit 9F/3 and 17F/2–55). Contrary to her allegation of financial constraints, the claimant even reported on one occasion that she stopped attending counseling because her symptoms had improved (Exhibit 17F/7). Also problematic, the claimant only presented intermittently to have her prescriptions renewed at free medical clinics or local emergency rooms.

Tr. at 28–29. Thus, the ALJ specifically indicated she did not discount Plaintiff's allegations based on noncompliance related to her financial constraints, but considered her allegations not fully supported given evidence of noncompliance that was not attributable to her financial constraints.

2.    Treating Physician's Opinion

Dr. Engleman completed a questionnaire on May 16, 2018, in which he indicated Plaintiff had extreme impairment as to: personal habits; ADLs; ability to understand, remember, and carry out complex instructions; ability to understand, remember, and carry out repetitive tasks; ability to maintain attention and concentration for periods of less than two hours; ability to make simple work-related decisions; ability to respond to customary work pressures; and ability to be aware of normal hazards and take appropriate precautions. Tr. at 740–41. Dr. Engleman rated Plaintiff as having marked limitation as to the following abilities: to interact appropriately with the general public; to ask simple questions or request assistance; to sustain a routine without special supervision; to respond appropriately to supervision and/or coworkers; and to respond appropriately to change in the work setting. *Id.* He stated Plaintiff could rarely perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Tr. at 741. He noted Plaintiff could never complete a normal workday and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* He was unable to estimate how often Plaintiff was likely to be absent from work per month. Tr. at 742. He indicated Plaintiff's limitations had lasted or were expected to last for 12 months or longer, but he

was unable to provide an opinion as to the earliest date her symptoms existed at that level of severity. *Id.* He indicated Plaintiff experienced side effects from medication that included tiredness and anxiety. *Id.*

Plaintiff argues the ALJ failed to provide an adequate explanation to support her allocation of little weight to Dr. Engleman's opinion. [ECF No. 13 at 22–23]. She maintains Dr. Engleman's opinion is supported by his records. *Id.* She asserts Dr. Engleman's records consistently document her inattentiveness and gaps in insight. [ECF No. 22 at 6]. She contends the ALJ misinterpreted indications of improvement within the records. [ECF No. 13 at 24].

The Commissioner argues the ALJ considered the relevant factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) in evaluating Dr. Engleman's opinion and concluded the opinion was not supported by his or the counselor's objective examination findings and Plaintiff's reported improvement. *Id.* at 24–27.

If a treating physician's medical opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record, the applicable regulations direct the ALJ to give it controlling weight. 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2).[3] "[T]reating physicians are given 'more weight .

. . since these sources are likely to be the medical professionals most able to

provide a detailed, longitudinal picture of [the claimant's] medical

impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone[.]'" *Lewis v.*

*Berryhill*, 858 F.3d 858, 867 (4th Cir. 2017) (quoting 20 C.F.R. §

404.1527(c)(2)).

"[T]he ALJ holds the discretion to give less weight to the testimony of a

treating physician in the face of persuasive contrary evidence." *Mastro v.*

*Apfel*, 270 F.3d 174 (4th Cir. 2011) (citing *Hunter v. Sullivan*, 993 F.2d 31, 35

(4th Cir. 1992)). However, if the ALJ does not issue a fully-favorable decision,

her decision "must contain specific reasons for the weight given to the

treating source's medical opinion, supported by the evidence in the case

record" and must be "sufficiently specific to make clear" to the court "the

weight [she] gave to the . . opinion and the reason for that weight." SSR 96-

2p, 1996 WL 374188, *5 (1996).

---

[3] Because Plaintiff filed her claim prior to March 27, 2017, the court considers the ALJ's evaluation of medical opinions based on the rules in 20 C.F.R. § 404.1527 and § 416.927 and SSRs 96-2p, 96-5p, and 06-03p. *See* 20 C.F.R. §§ 404.1520c, 416.920c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 [§ 416.927] apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSRs 96-2p, 96-5p, and 06-03p were effective for "claims filed on or after March 27, 2017").

An ALJ cannot reject a treating physician's opinion upon concluding it is not entitled to controlling weight. SSR 96-2p, 1996 WL 374188, at *4. She must evaluate and weigh the opinion based on the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c), which include "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)).

"[A]bsent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion," *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam), the court should not disturb the ALJ's weighing of the medical opinions of record.

The ALJ acknowledged that Dr. Engelman treated Plaintiff between November 13, 2015, and March 6, 2018. Tr. at 25. She conceded that greater weight should generally be allocated to the opinion of a treating source, but explained that she was assigning little weight to Dr. Engelman's opinion because it was "totally inconsistent with his treatment records where he repeatedly examined the claimant with unremarkable findings and the claimant reported improved and stable findings following treatment with

55

prescription medications." Tr. at 26. She cited "mostly unremarkable findings" during November 13, 2015 and February 8, 2016 exams. Tr. at 25. She noted Plaintiff's report of reduced anxiety and depression after starting Wellbutrin. *Id.* She noted Dr. Engelman added Trazodone in February 2016 and continued Plaintiff's medications in September and December 2016. Tr. at 25–26. She indicated Plaintiff reported mild and manageable symptoms in December 2016. Tr. at 26. She acknowledged Dr. Engelman stopped Wellbutrin in June 2017, after Plaintiff reported reduced anxiety symptoms when not taking it. *Id.* She noted Plaintiff reported increased attention and manageable anxiety when Dr. Engelman prescribed Adderall 5 mg. *Id.* She stated Plaintiff reported improved and stable anxiety in October 2017 and January 2018. *Id.* She referenced Dr. Engelman's "mostly unremarkable findings" and continuation of medications in March 2018. *Id.* She wrote: "Contrary to this opinion, Dr. Engelman's records reflect that the claimant's anxiety was increased due to financial stressors and daughter's health, but it was also improved from baseline and tolerable (Exhibit 17F). As previously discussed, his reports are similar throughout 2017 and 2018 (Exhibit 17F)." *Id.* The ALJ also considered it "worth noting the claimant had breaks in counseling and her counseling findings were generally unremarkable." *Id.* Earlier in the opinion, the ALJ discussed treatment records from Plaintiff's counseling sessions, noting generally unremarkable findings and reports of

progressing treatment and improved functioning, despite occasional periods of increased personal stressors that caused her to feel overwhelmed. *See* Tr. at 24–25. Thus, the ALJ considered Dr. Engelman's opinion unsupported by his treatment notes and inconsistent with the counseling notes and Plaintiff's reports of improved symptoms. *See* Tr. at 25–26.

The ALJ cited sufficient reasons to find Dr. Engelman's opinion was not entitled to controlling weight, as it is was inconsistent with some of the other evidence of record. However, she failed to reconcile Dr. Engelman's consistent findings on MSE of inattentiveness, gaps in insight, and dysthymic mood and his frequent findings of variable concentration with her allocation of little weight to his opinion. *See* Tr. at 503–04, 708–09, 711–12, 714–15, 717–18, 720–21, 723–24, 726–27, 729–30. These findings do not provide adequate support for all the restrictions Dr. Engelman set forth in his opinion, but they tend to bolster his opinions that Plaintiff would be extremely limited in her ability to maintain attention and concentration for periods of less than two hours; markedly limited in her ability to sustain a routine without special supervision and to respond appropriately to change in the work setting; and could never complete a normal workday and work week without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. *See* Tr. at 741.

If the ALJ had specifically addressed this evidence and explained how the other evidence refuted it, her allocation of little weight to Dr. Engleman's opinion would be supported. Unfortunately, she stated Dr. Engleman's records showed "mostly unremarkable findings," Tr. at 25, 26, without acknowledging the abnormalities he observed. Although the ALJ cited Plaintiff's reports of improved and stable symptoms, she did not reconcile those reports with Dr. Engleman's continued observations of inattentiveness, gaps in insight, dysthymic mood, and variable concentration on MSEs during the same visits.

To properly evaluate a claimant's RFC, the ALJ must thoroughly consider all the relevant evidence to include treating physicians' opinions, and must reconcile all conflicting evidence. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 16-3p, 2016 WL 1119029, at *7. Because the ALJ did not reconcile all the conflicting evidence in evaluating Dr. Engleman's opinion, remand is appropriate. *See Mascio*, 780 F.3d at 636.

III.   Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the

undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

*Shiva V. Hodges*

September 10, 2020
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge